CRAIG H. MISSAKIAN (CABN 125202)
United States Attorney

**FILED**

**25 August 2026**

Mark B. Busby
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>RUBEN IAN THOMSON,<br>a/k/a "TeamPCP",<br><br>Defendant. | CASE NO. 3:26-cr-00426 CRB<br><br>VIOLATIONS:<br>18 U.S.C. § 371 – Conspiracy;<br>18 U.S.C. §§ 1030(a)(2)(C) and (c)(2)(B) – Obtaining Information from a Protected Computer;<br>18 U.S.C. § 2 – Aiding and Abetting;<br>18 U.S.C. §§ 982(a)(2)(B) and 1030(i) and (j) – Forfeiture Allegation<br><br>SAN FRANCISCO VENUE |

# INDICTMENT

The Grand Jury charges:

## Introductory Allegations

At all times relevant to this Indictment, except where otherwise stated:

A. Overview

1. **RUBEN IAN THOMSON** was a South African and Australian national who operated online under the moniker "TeamPCP."

2. Company A was a company with a location in Burlington, Massachusetts. Company A provided security applications in the software supply chain from development to production. Company A designed a widely-used, open-source vulnerability scanner tool ("Company A's Tool").

3. Company B was a company with location in San Francisco, California, which is the Northern District of California. Company B provided a unified interface for software developers to switch among various Large Language Models (LLMs), that are a type of artificial intelligence (AI) trained on massive datasets to understand, process, and generate human-like text, code, and images ("Company B's Tool").

4. Company C was a company with a location in Sunnyvale, California and computer systems hosted in Fremont, California, both of which are in the Northern District of California. Company C offers a container security and vulnerability management platform for software supply chains.

5. Company D was a company with a location and computer systems in San Francisco, California, which is in the Northern District of California. Company D provides a platform that connects skilled professionals with remote contract opportunities at AI laboratories and technology companies.

B. <u>Relevant Terms</u>

6. As used herein, the words "exfiltrated" and "exfiltration" mean the action and result of, respectively, the unauthorized transfer of information from a computer system.

7. As used herein, the words "exploited" and "exploitation" mean the action and result of, respectively, using a technique to breach the security of a computer system in violation of a security policy.

8. As used herein, the word "mitigate" means to apply one or more measures to reduce the likelihood of an unwanted occurrence and/or lessen its consequences.

C. <u>The Scheme</u>

9. **THOMSON** conspired and agreed with others known and unknown to the Grand Jury to commit Computer Fraud and Abuse Act violations, that is, to intentionally access a protected computer without authorization and to obtain information from a protected computer; to cause the transmission of a program, information, code, and command and to intentionally cause damage without authorization to a protected computer; to threaten to impair the confidentiality of information obtained from a protected computer without authorization with intent to extort from a person money and other things of value; and

demand money and other things of value in relation to damage to a protected computer with intent to extort from one or more persons any money and other things of value.

D. Manner and Means

10. **THOMSON** and/or his coconspirators exploited trusted supply chain software security tools. Impacted victims included companies that created and maintained these tools. **THOMSON** and/or his coconspirators injected malicious code into these companies' tools.

11. The exploitation of the computer systems of these companies then cascaded, affecting downstream customers that utilized these tools. Specifically, the malicious code would scan a downstream customer's computer system for sensitive data to steal. If sensitive data was identified, the malicious code compressed and encrypted the sensitive data and attempted to exfiltrate that data to one or more computers controlled by **THOMSON** and/or his coconspirators. The malicious code also enabled persistent access to the downstream customer's computer system.

12. Following the exfiltration of data from the computer system of a downstream customer, **THOMSON** and/or his coconspirators extorted ransom payments in exchange for a promise to not publicly release the data exfiltrated from the company.

E. Overt Acts

13. **THOMSON** and/or his coconspirators initially attacked Company A, and then exploited that access to then exploit Company B's and Company C's computer systems. As a result of the attack on Company B's computer system, **THOMSON** and/or his coconspirators were able to attack and exploit the computer system of Company D.

F. Attack on Company A's Tool

14. On or about February 26, 2026, **THOMSON** and/or his coconspirators exfiltrated access credentials and established access to the computer system for Company A, including the development environment for Company A's Tool.

15. On or about March 1, 2026, Company A attempted to mitigate the exploitation, but **THOMSON** and/or his coconspirators still maintained unauthorized access to the development environment for Company A's Tool, and obtained sensitive information from Company A's computer system.

16. On or about March 19, 2026, **THOMSON** and/or his coconspirators injected malicious code into Company A's Tool that was already trusted and used by customers. Then, **THOMSON** and/or his coconspirators published a malicious version of Company A's Tool for companies to use in their computer systems.

17. Company A's Tool with the malicious code propagated to many customers' computer systems that were set to automatically update with the newest version of the tool when it was published.

G. Attack on Company B

18. On March 24, 2026, two versions of Company B's Tool were exploited with malicious code that resulted from the exploitation of Company A's Tool described above, on which Company B's Tool had a dependency. Any customer that installed or upgraded Company B's Tool on or about March 24, 2026, between around 10:39 UTC and around 16:00 UTC, was negatively impacted.

19. The malicious code deployed by **THOMSON** and/or his coconspirators included a credential stealer designed to search for sensitive credential data.

20. Once that data was identified, the malicious code encrypted and exfiltrated that data to infrastructure controlled by **THOMSON** and/or his coconspirators.

H. Attack on Company C

21. On or about March 19, 2026, Company C downloaded Company A's Tool with malicious code onto Company C's computer system located on a server hosted in Fremont, California.

22. On or about March 19, 2026, Company C experienced unauthorized credential use, and Company C's data was accessed and thereafter exfiltrated to infrastructure controlled by **THOMSON** and/or his coconspirators.

23. On or about July 21, 2026, data exfiltrated from Company C attributed to TeamPCP was advertised for sale for $40,000 on an online forum used by cybercriminals.

I. Attack on Company D

24. On or about March 24, 2026, Company D experienced an initial exploitation when an employee's laptop, which was in San Francisco, California, had downloaded Company B's Tool with malicious code onto it.

25. The malicious code allowed **THOMSON** and/or his coconspirators to gain access to

Company D's computer system. As a result, Company D's data was exfiltrated.

26. Following the exfiltration, **THOMSON**'s coconspirators extorted ransom payments from Company D to prevent the release of Company D's exfiltrated data. On April 2 and 5, 2026, Company D made payments totaling $700,000 to prevent the publication on the Internet of sensitive data that was exfiltrated by **THOMSON** and/or his coconspirators' use of malicious code, with that data including various persons' personal identifying information.

<u>COUNT ONE</u>: (18 U.S.C. § 371 – Conspiracy)

27. Paragraphs 1 through 27 of this Indictment are realleged and incorporated as if fully set forth here.

28. From at least as early as in or around February 26, 2026, through at least in or around August 25, 2026, in the Northern District of California, and elsewhere, the defendant,

**RUBEN IAN THOMSON**,

who will first be brought to the Northern District of California within the meaning of 18 U.S.C. § 3238, and others known and unknown to the Grand Jury, did knowingly and intentionally conspire and agree to commit offenses against the United States, that is,

a. to intentionally access a protected computer without authorization, and thereby obtain information from a protected computer, and commit the offense for purposes of commercial advantage and private financial gain, and commit the offense in furtherance of a criminal and tortious act in violation of the Constitution and laws of the United States and any state, and for the value of the information obtained to exceed $5,000 in violation of Title 18, United States Code, Sections 1030(a)(2)(C) and (c)(2)(B);

b. to knowingly cause the transmission of a program, information, code, and command, and, as a result of such conduct, intentionally cause damage without authorization to a protected computer, and as a result of such conduct cause loss to one or more persons during a 1-year period aggregating at least $5,000 in value and cause damage affecting 10 or more protected computers during a 1-year period, in violation of Title 18, United States Code, Sections 1030(a)(5)(A) and (c)(4)(B);

c. with intent to extort from a person money and other things of value, to transmit in

interstate and foreign commerce any communication containing a threat to impair the confidentiality of information obtained from a protected computer without authorization, in violation of Title 18, United States Code, Sections 1030(a)(7)(B) and (c)(3)(A); and

d. with intent to extort from one or more persons any money and other things of value, to transmit in interstate and foreign commerce, one or more communications containing one or more demands and requests for money and other things of value in relation to damage to a protected computer, which damage was caused to facilitate the extortion, in violation of Title 18 United States Code Sections 1030(a)(7)(C) and 1030(c)(3)(A).

29. All in violation of Title 18, United States Code, Section 371.

COUNTS TWO AND THREE: (18 U.S.C. §§ 1030(a)(2)(C), (c)(2)(B), and 2 – Obtaining Information from a Protected Computer; Aiding and Abetting)

30. Paragraphs 1 through 27 of this Indictment are re-alleged and incorporated as if fully set forth here.

31. On or about the dates set forth below, in the Northern District of California and elsewhere, the defendant,

**RUBEN IAN THOMSON,**

who will first be brought to the Northern District of California within the meaning of Title 18, United States Code, Section 3238, and others known and unknown to the Grand Jury, attempted to and did intentionally access a protected computer in the Northern District of California without authorization, and thereby obtained information from a protected computer, and committed the offense for purposes of commercial advantage and private financial gain, and committed the offense in furtherance of a criminal and tortious act in violation of the Constitution and laws of the United States and any state, and the value of the information obtained exceeded $5,000, all without authorization; specifically:

| Count | Approximate Date of Offense | Victim |
|---|---|---|
| 2 | March 19 through March 30, 2026 | Company C |
| 3 | March 24 through April 5, 2026 | Company D |

32. All in violation of Title 18, United States Code, Sections 1030(a)(2)(C) and (c)(2)(B), and 2.

<u>FORFEITURE ALLEGATION</u>: (18 U.S.C. §§ 982(a)(2)(B) and 1030(i) and (j))

33. The allegations contained in this Indictment are re-alleged and incorporated by reference for the purpose of alleging forfeiture pursuant to Title 18, United States Code, Sections 982(a)(2)(b) and 1030(i) and (j).

34. Upon conviction for one or more of the offenses set forth in this Indictment, the defendant,

**RUBEN IAN THOMSON**,

shall forfeit to the United States, pursuant to Title 18, United States Code, Sections 982(a)(2)(b) and 1030(i) and (j), any personal property used or intended to be used to commit or to facilitate the commission of said violation or a conspiracy to violate said provision, and any property, real or personal, which constitutes or is derived from proceeds traceable to the offenses, including, but not limited to, a sum of money equal to the total amount of proceeds defendant obtained or derived, directly or indirectly, from the violation, or the value of the property used to commit or to facilitate the commission of said violation.

35. If any of the property described above, as a result of any act or omission of the defendant:

a. cannot be located upon exercise of due diligence;

b. has been transferred or sold to, or deposited with, a third party;

c. has been placed beyond the jurisdiction of the court;

d. has been substantially diminished in value; or

e. has been commingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 1030(i)(2).

36. All pursuant to Title 18, United States Code, Sections 982(a)(2)(B) and 1030, and Federal

//

//

//

//

Rule of Criminal Procedure 32.2.

DATED: August 25, 2026

A TRUE BILL.

/s/
FOREPERSON

CRAIG H. MISSAKIAN
United States Attorney

/s/
DANIEL N. KASSABIAN
Assistant United States Attorney